# Exhibit 3

1   memory with your attorneys as to what this case is

2   all about?

3          A.   No, sir.

4          Q.   Okay.  Officer Guillot made a stop with

5   Dahl.  And during that time, he used some profane

6   language, so Mr. Dahl is saying in his testimony.

7   Would that be something that the police would

8   condone, that you or your office would condone?

9               MR. HARVEY:  Let me just run an objection

10         to anything that's Mr. Dahl's account of events

11         to form; but other than that, continue.

12              MR. MOAK:  Let me just --

13              MR. HARVEY:  I just want to register it

14         once.

15   BY MR. MOAK:

16         Q.   Would your office condone the use of

17   improper language as to any person that they had

18   made a stop against?

19         A.   We have a standard operating procedure, and

20   our procedures are in black and white, and that's

21   where what is right and wrong is.

22         Q.   And so that procedure would be that you

23   would not use that type of language?

24         A.   I didn't say that, no, sir.  I said it's in

25   black and white.  If it's in there, then that would

1   A.   There was a new administration came in, in

2   the end of December, the beginning of January, and

3   the mayor took the Tasers away from the police

4   department.

5   Q.   Was there a public meeting that discussed

6   why --

7   A.   Not that I recall.

8   Q.   How were you notified that they were going

9   to be taken away?

10   A.   The mayor.

11   Q.   What did he tell you?

12   A.   He said bring me every Taser.

13   Q.   What else?

14   A.   That's about it.

15   Q.   That was it?

16   A.   (Nodding head.)

17   Q.   Did you have any meetings with city

18   attorneys or any other officials as to why they were

19   gone?

20   A.   No, sir.

21   Q.   What kind of response did you get from the

22   officers when those were taken?

23   A.   Sort of disappointed.

24   Q.   Why were they disappointed?

25   A.   Well, it's a very good tool.

16

1    Q.   Do you know how many times officers in your

2    city have used stun guns on a yearly basis when they

3    were available, actually deployed them, let me say

4    that.

5    A.   I would have to go back in the records.

6    Q.   What do you think is normal usage, the

7    number of times that an officer would use or deploy

8    a Taser weapon?

9    A.   I have no idea.

10   Q.   You have never looked at any facts or

11   figures around the U.S. or even within your city?

12   A.   That -- rephrase that question.

13   Q.   Sure.  You've never had the opportunity to

14   look at studies that would say a Taser is deployed

15   by an average law enforcement officer X number of

16   times per year in the line of duty?

17   A.   No, sir.

18   Q.   That same question:  Have you ever seen any

19   studies to determine how many times a Taser is, or

20   has been in this case now, deployed by any officer

21   in your city?

22   A.   We did do it, like I said, but I couldn't

23   quote any amounts unless I looked at the record.

24   And I'm not sure that I could find that now.

25   Q.   Do you think your city deployed Tasers more

1   often then anyone else?

2       A.   No, sir.

3       Q.   Have you received any information via press

4   releases that your city has used Tasers more than

5   any other city or organization?

6       A.   I've read that, yes, sir.

7       Q.   Tell me what you read.

8       A.   I don't recall what it was.

9       Q.   Was it an analysis of your city with the

10  Marines in Iraq?

11      A.   I don't recall that.

12      Q.   Well, let me get a little tighter.  Was it

13  an analysis that the officers in the City of

14  Waveland had used their Tasers more often than

15  Marines in the Middle East?

16      A.   I don't recall that.

17      Q.   Would it surprise you that if I said during

18  a three-year period that officers in the City of

19  Waveland deployed Tasers 191 times?

20      A.   Over three years?

21      Q.   Correct.

22      A.   Would it?

23      Q.   Would it surprise you?

24      A.   No, sir.

25      Q.   Do you think that would be a normal



1  occurrence?

2     A.   I'm not aware.

3     Q.   If the information is actually not

4  available on a server or if the information has been

5  lost, sent back to the manufacturer, and I still

6  said the City of Waveland officers deployed their

7  Tasers 191 times in a three-year time period, you

8  actually couldn't verify that fact either, could

9  you?

10     A.   I'm not sure.

11     Q.   Because part of the information, as you

12  said earlier, could have been lost.

13     A.   I'm sure I could go back and get it off the

14  records, the paper records, but I wouldn't have it

15  available just to go back and look at it.

16     Q.   So in this instance, would you be able to

17  go back on March 31st, 2008, and get the paper

18  record to see how many times Officer Guillot

19  deployed his Taser?

20     A.   No, sir, I would not.  I would be able to

21  go back and look at the police officer's report and

22  the use-of-force report.

23     Q.   So the police officer report is the system

24  you use to determine the number of times Tasers are

25  deployed, a police officer's report?

24

1   the scene and that Officer Besse said that she was

2   refusing.   Officer Besse tells Guillot that she was

3   refusing, and Officer Guillot then tases Holland

4   based on that information; correct?

5      A.   Well, I think he told her to get out

6   repeatedly, and she refused.

7      Q.   And that's enough for the use of a Taser at

8   that point?

9      A.   Yes, sir, I would think so, two drunks on a

10  highway.

11     Q.   Okay.  And now we've got Mr. Dahl in the

12  back seat of Officer Guillot's car.

13     A.   Yes, sir.

14     Q.   We have Officer Besse and Officer Guillot

15  now dealing with Holland, and she is now in the back

16  of Officer Besse's car; correct?

17     A.   Yes, sir.

18     Q.   The tow truck shows up.  They go to the

19  police station.  At that time, due to the report, we

20  still believe that Dahl is handcuffed; correct?

21     A.   It doesn't say that they unhandcuffed him,

22  no, sir.

23     Q.   Okay.  So then we believe he is still

24  handcuffed?

25     A.   Yes, sir.

1     Q.   Yes, sir.

2     A.   So it is very -- it could be a real big

3  problem, two people in there, one -- two people

4  drunk, belligerent.  So, yes, sir, I don't see any

5  problem.

6     Q.   You've mentioned twice that there were two

7  people drunk.  Do you know that either one of these

8  were found guilty?

9     A.   I'm not -- I'm jut saying what the report

10  says, sir.  I don't know that.

11     Q.   Okay.  Officer didn't know that at the time

12  either, did he?

13     A.   I can't testify what the officer knew.

14     Q.   Okay.  Then if you'll read on, Officer

15  Guillot says that he's attempting to gain compliance

16  again, and Dahl flinches, attempts to move out of

17  the way of the stun gun and is hit or struck in the

18  head.  Does Waveland PD teach using a stun gun

19  toward the head?

20     A.   No, sir.

21     Q.   You had also mentioned earlier in just your

22  cursory review of the report again that Mr. Dahl had

23  said that he had a brain injury.  Would that be

24  another -- would that be something that would

25  concern you, that a stun gun was used toward the

31

1       A.    In the academy, yes, sir.

2       Q.    In the academy?

3       A.    (Nodding head.)

4       Q.    Nothing in-house?

5       A.    There may be some according to what classes

6    we are offered that they could have some -- you

7    know, during the year after they get out of the

8    academy, you know, in-service training.

9       Q.    All of your officers go to the academy?

10      A.    Yes.

11      Q.    They have to complete the academy before

12   you hire them?

13      A.    Yes.

14      Q.    And as to the stun -- the stun guns that

15   were issued, tell me what kind of training they had

16   for that.

17      A.    An instructor teaches that.

18      Q.    Who is the instructor?

19      A.    We've had numerous.

20      Q.    Do you investigate the background of the

21   instructors?

22      A.    I personally have known all the

23   instructors.

24      Q.    And what would be the basics that an

25   instructor -- the basic background an instructor

1  would have to have before he was able to teach your

2  officers about the use of Tasers?

3      A.  I'm not sure what background they have to

4  have as far as what it takes to become an

5  instructor.  I don't know.

6      Q.  Do you ever have any instructors who are

7  either representatives of the Taser manufacturer or

8  instructors who have completed certification by the

9  Taser manufacturer?

10     A.  The very first ones from Orange County

11 were, but that was in 2006, so I don't think any

12 time after that.

13     Q.  Where do you normally get your instructors

14 from?

15     A.  Most of them have been from the police

16 department and went and had certification.

17     Q.  So it would be in-house instructing?

18     A.  No, sir.

19     Q.  Well, tell me how that works.

20     A.  Somebody in my department would go to a

21 school put on by the academy, the Taser people,

22 somebody, and they teach them to come back and teach

23 the police department.

24     Q.  Okay.  So all of your instructors would

25 have at least that minimum?

1    they thought were improper acts of a police officer,

2    where would they report that?

3        A.   To the police department, to me.

4        Q.   They'd report it to you?  Is there any

5    other state agency that you know of where a person

6    would make a report?

7        A.   Highway patrol, FBI.

8        Q.   Is that normally where these reports are

9    made?

10       A.   I've seem them go to MBI.  I've seen them

11    go to the FBI.

12       Q.   Okay.  You've seen that.  Do you have

13    knowledge of the FBI investigating the Waveland

14    Police Department on any other complaint besides

15    this one?

16       A.   Officers.

17       Q.   You do?

18       A.   Yes, sir.

19       Q.   Who were those officers?

20       A.   I don't recall.

21       Q.   Who would recall?

22       A.   The FBI.

23       Q.   Is there an agent in charge with the FBI

24    that you know who would be investigating your

25    officers?

44

1   than asking for the reports.

2       Q.   Do you have any sort of in-house policy

3   developed that when the FBI calls that you commence

4   some sort of in-house investigation?

5       A.   No, sir.

6       Q.   Do you think you should have one?

7       A.   No, sir, because I don't even know what the

8   complaint is.

9       Q.   No, I'm just asking based upon the

10  previous --

11      A.   No, sir.

12      Q.   Okay.  Do you have conversations or do you

13  have someone to have conversations with your

14  officers dealing with how to conduct a stop, how

15  to -- first of all, let me stop there.  Any sort of

16  training with the officers that this is how you

17  conduct a stop?

18      A.   Yes, sir.

19      Q.   Tell me how that works.  Do you have that

20  in a big meeting, or is it one on one?

21      A.   It's not done in-house, no, sir.

22      Q.   Who does that?

23      A.   The state.

24      Q.   What state agency does that?

25      A.   The academy, minimum standards, the

1      A.   I don't think it was a year and a half, no,
2  sir.
3      Q.   Was it a year, do you think?  I guess we
4  could find out by his records.
5      A.   Yes, sir.  I don't think it was even a
6  year.
7      Q.   And during that time period, whether it was
8  on the truck or not, from '07 to '10, two and a half
9  years without taking out the time for truck driving,
10  he would have deployed his Taser 23 times based on
11  some sort of report that you got in-house.  You
12  don't think that would be excessive?
13     A.   Well, I mean, is that a fact?
14     Q.   Yes, sir.  That's what I was given.
15     A.   In how long?
16     Q.   Well, I'm saying from June 2007, December
17  2010, two and a half years, and then take off some
18  time for driving a truck, but being most
19  conservative don't even take off any time for
20  driving a truck, two and a half years he deployed
21  the Taser 23 times.  Is that excessive?
22     A.   I don't know what -- no, sir, I don't think
23  so.
24     Q.   If a subject, in this case Mr. Dahl, was
25  already in handcuffs and he was tased while he was

1    in the City of Waveland?

2              MR. HARVEY:  I'm just going to repeat the

3         objection because I think it's vague, but you

4         can answer.

5    BY MR. MOAK:

6         Q.   I'll put it another way.  Does it surprise

7    you that Officer Guillot used the Taser in this

8    manner on Mr. Dahl?

9         A.   No, sir, it doesn't.

10        Q.   If I said you have 41 officers in the City

11   of Waveland since 2007, would that be about right?

12        A.   I couldn't tell you.

13        Q.   Do you have a high turnover rate?

14        A.   Not usually.

15        Q.   Do you know what your percentage of

16   turnover is?

17        A.   No, sir.

18        Q.   But your force runs anywhere from 14 to 19

19   on any given month?

20        A.   No, sir.  It ran 19 for a long time, and

21   then we had layoffs.

22        Q.   When did those layoffs happen?

23        A.   This year.

24        Q.   Okay.  What position does a sergeant -- is

25   he now still a sergeant, Israel Neff?