# Exhibit 4

1  Q. And what was the outcome of that?
2  A. He told me he couldn't do it because he had
3  a brain injury, so I didn't give it to him.
4  Q. So when the field sobriety test didn't
5  happen, is that when you cuffed him?
6  A. It would have been afterwards.
7  Q. Where was he standing when you cuffed him?
8  A. Between my car and his car or on the side
9  of my car.
10 Q. Okay. I'm going to jump around here in
11 just a second and then go specifically to an area.
12 But when Dahl was tased the first time, that was
13 inside the police department?
14 A. Yes.
15 Q. And you say he was without handcuffs?
16 A. Yes.
17 Q. Was he an immediate threat to you when you
18 tased him?
19 A. He wasn't complying with my orders.
20 Q. Was he actively resisting you?
21 A. Well, actually, he was being belligerent,
22 kicking the desk.
23 Q. Did he try to evade you?
24 A. No.
25 Q. Now, when you initially stopped him on the

1   Q.   He refused?
2   A.   Yes.
3   Q.   Is that in your statement?
4   A.   I don't believe so.
5   Q.   Why not?
6   A.   I can't tell you.
7   Q.   Don't you think as a police officer that's
8   pretty big? Didn't you stop him for DUI?
9   A.   Yes.
10  Q.   And if a person refuses a breath test,
11  isn't there a charge called "DUI refusal"?
12  A.   Sure is.
13  Q.   Is that what you charged him with?
14  A.   I don't remember, most likely.
15  Q.   Most likely that's what you did? We'll get
16  to that in a second.
17       So he was uncuffed so he could take the
18  test; is that right?
19  A.   Right.
20       MR. HARVEY: If he was booking him, it was
21  at the same time, the booking.
22       MR. MOAK: Okay.
23  BY MR. MOAK:
24  Q.   You took his fingerprints?
25  A.   I think we did that -- at the time, we

1  Q. Okay. Do you remember talking to me at
2  anytime prior to that time?
3  A. No. This is the first time I've spoken
4  with you. I've got your correspondence in reference
5  to the lawsuits that you filed. But other than
6  that --
7  Q. What are you talking about there?
8  A. The lawsuits, the file that you sent over
9  to the police department.
10  Q. Oh, okay. Okay.
11       So the use -- and I'm kind of jumping here,
12  but the use of the Taser on Mr. Dahl was not
13  necessary to make an arrest?
14  A. No.
15  Q. Because the initial arrest had taken place
16  before you used the Taser on him.
17  A. That's correct.
18  Q. On Dahl.
19  A. That's right.
20  Q. Do you know a person, a particular person
21  that I might contact if I were to find this digital
22  video from the car and from both the cars?
23  A. The best person would probably be David
24  Allen. He works at the Waveland Police Department.
25  Q. I forgot to ask you earlier. Are you

1   Q.   Was she tased that night?
2   A.   Yes.
3   Q.   Who tased her?
4   A.   I did.
5   Q.   How many times?
6   A.   Once.
7   Q.   Once. Now, when was the first time, the
8   only time that you say -- when was she tased? Where
9   was she?
10  A.   Sitting on the -- in the passenger's seat
11  of the vehicle that Mr. Dahl was driving.
12  Q.   And why was she tased?
13  A.   Because she wouldn't get out of the car.
14  Q.   Did you know her?
15  A.   No.
16  Q.   Had she done anything improper?
17  A.   She was being loud and profane, refusing to
18  comply with my orders to get out of the car. Other
19  than that, I don't remember.
20  Q.   She was inside her own car?
21  A.   It was the Lexus that they were in.
22  Q.   You had made the stop?
23  A.   Yes.
24  Q.   She was a passenger?
25  A.   Yes.

Case 1:09-cv-00765-LG-RHW   Document 56   Filed 09/06/11   Page 6 of 14

37

```
 1      A.   The bottom line is I ordered her to get out
 2 of the car.  If you fail to comply with that order,
 3 it's a charge.  You go to jail, period.
 4      Q.   Well, first of all you get tased.
 5      A.   Well, that was her case because she
 6 refused.
 7      Q.   Okay.
 8      A.   The initial plan was to have her go to the
 9 Exxon and have someone come pick her up.
10      Q.   But the choice was hers to get tased.  Is
11 that what it is?
12      A.   The choice was hers not to comply with my
13 orders.  The result of that was getting tased.
14      Q.   And your choice was to tase her?
15      A.   Well, it was either tase her or manhandle
16 her.  Taser is much safer in my opinion.
17      Q.   Okay.  Do you recall how big this woman is?
18      A.   Not big.
19      Q.   Not big.  Could you take her?
20           MR. HARVEY:  Object to the form.
21 BY MR. MOAK:
22      Q.   Could you handle her?
23      A.   Most likely, I could have been pulled her
24 out of the car, yeah.
25      Q.   But it was your decision to tase her?
```

SIMPSON BURDINE & MIGUES - (228) 863-4455
POST OFFICE BOX 635, GULFPORT, MS   39502-0635

```
 1     Q.    You never saw her again.
             Did you ever drive-stun tase a woman?
 2
 3     A.    Drive-stun tase a woman?
 4     Q.    Drive-stun tase her?
 5     A.    No, sir.
 6     Q.    Ms. Holland?
 7     A.    No.
 8     Q.    You never used your Taser again?  That's
 9  your testimony?
10     A.    I shot her with the Taser.  And then when
11  she came out of the car, Eddie said she was still
12  refusing, resisting to put her hands behind her
13  back.  I pulled the trigger again, delivered another
14  five seconds stun, and then she complied.  She was
15  handcuffed.
16     Q.    So is that tasing her once or tasing her
17  twice?
18     A.    I shot her once and delivered the
19  electricity twice.
20     Q.    So is that tasing her once or tasing her
21  twice?
22         MR. HARVEY:  Asked and answered.  You can
23     answer it if you want.
24     A.    I would say once.
25  BY MR. MOAK:
```

1  you were at the police department with Dahl?
2      A.  Not to my recollection.
3      Q.  And as to Mr. Dahl and the stun gun, you're
4  saying that you tased him once; is that correct?
5      A.  I drive-stunned him once.  And I went to
6  drive-stun him a second time, and that's when I
7  accidentally scraped his head.
8      Q.  Can I ask you to look at some photographs
9  that were provided?  And these were listed as
10 Exhibit 22, and we will use the same exhibit in
11 numerical sequence.
12                       - - -
13              (Exhibit No. 5 marked)
14 BY MR. MOAK:
15     Q.  Do you recognize that that's Mr. Dahl in
16 the photographs?
17     A.  Yes.
18     Q.  Is that on Mr. Dahl's -- Mr. Dahl's
19 right-hand side of his head?  Does that appear to be
20 the cut that was that night?
21     A.  I remember it being on the left side of his
22 head.
23     Q.  Oh, really?
24     A.  Uh-huh, because I'm right-handed, and it
25 would have been on the left side of his head.

```
 1    it's back over here in another room.
 2         Q.   And would you put an X as to where Mr. Dahl
 3    was sitting.
 4         A.   Okay.
 5         Q.   And put a Y where you were located.
 6              So you're sitting on one side of the desk,
 7    and he's sitting on the other.
 8         A.   Uh-huh.
 9         Q.   And you initially drive-stun him; correct?
10         A.   Uh-huh.
11         Q.   Now, where were you -- and you don't have
12    to draw this, but where were you when you
13    drive-stunned him?
14         A.   Standing right here next to him.
15         Q.   Is that when you initially brought him into
16    the room?
17         A.   No.
18         Q.   So both of you were seated on the opposite
19    sides of the desk?
20         A.   Correct.
21         Q.   Are you telling us, then, that you got up
22    from your side of the desk and went over there and
23    drive-stunned him?
24         A.   Yeah.
25         Q.   And you had said earlier that you stunned
```

1  him in the left shoulder area?
2       A.   Yes, upper area right here somewhere.
3       Q.   Upper -- he's pointing upper left shoulder
4  region, upper chest shoulder region. And the reason
5  for that was why?
6       A.   Because he was being belligerent and
7  combative and he wouldn't sit back down.
8       Q.   You are right-handed?
9       A.   Yes.
10      Q.   And where did this cut -- whether it's on
11 the right or left-hand side, where was Mr. Dahl at
12 that time?
13      A.   Roughly, the same place.
14      Q.   And had you gone back and sat behind the
15 desk again?
16      A.   Before that, yes.
17      Q.   So you got up from the desk again?
18      A.   Uh-huh.
19      Q.   Went around?
20      A.   That's right.
21      Q.   And were attempting to drive-stun him
22 again?
23      A.   Uh-huh.
24      Q.   And you believe the Taser hit him on his
25 left.

1  is tased, do you police officers talk about those
2  cases with each other?
3      A.  Not really.  Usually, the shift might have
4  a safety briefing or something.  That's up to the
5  individual supervisors.
6      Q.  Have you ever had any safety briefing after
7  using a Taser?
8      A.  No, not me myself.
9      Q.  Who has?
10     A.  Other shifts, I guess.  I would imagine.
11 It's up to the supervisor.
12     Q.  Do you know of any briefings that they have
13 had?
14     A.  When I say "briefing," it's like, Is there
15 anything we could have -- you know, what was the
16 officer's safety issue?  Is there anything we could
17 have done different?  You know, just try to keep
18 each other alive.  That's all it's for.  I don't
19 know of any particular -- I can't sit here and tell
20 you any particular time and date of any of them.
21     Q.  Going back to Holland for just a second.
22     A.  Okay.
23     Q.  When she's sitting in the passenger side
24 and her door is open and Besse is standing there
25 next to her, did you reach inside the car to shoot

1  her?

2  A.  Uh-huh.

3  Q.  Was there a danger of you missing her and
4  hitting Besse?

5  A.  No, because he was standing behind the
6  doorway.

7  Q.  Was Besse in the best position to deal with
8  Holland or were you?

9  A.  Probably me because she was in front of him
10 and inside the car.  He wasn't past the doorway.  He
11 could see what she was doing, but he wasn't in a
12 position to maybe have gotten an accurate shot with
13 a Taser or anything like that.

14 Q.  If he had decided to use his Taser.

15 A.  If he would have decided, he probably would
16 have moved -- he would have had to have moved to
17 deploy his Taser.

18 Q.  So he was that close?

19 A.  He was standing right outside the doorway.

20 Q.  So I guess what I'm asking is:  In your
21 opinion, you thought it was better that you deploy
22 your Taser while you're standing on the driver's
23 side with the door open standing next to the roadway
24 rather than Besse who was within two feet or three
25 feet of reaching in and just simply bringing her out

1  of the car?
2      A.  I think it's still safer to use a Taser.
3      Q.  You think it was safer under those
4  circumstances that night that you tase her instead
5  of Besse making the step to attempt to control her
6  if he needed to control her?
7      A.  That's right, yes.
8      Q.  You do?
9      A.  Uh-huh.
10     Q.  Why?
11     A.  Taser is a lower level of force than hands
12 on.
13     Q.  So you would use a Taser rather than
14 attempt to hands-on somebody?
15     A.  Or pepper spray.
16     Q.  In all instances?
17     A.  I mean, everything changes.  I mean,
18 situations change, you know, by the second, but most
19 of the time, yes.  I would use my use of force
20 options which would be pepper spray, which I don't
21 have a Taser anymore.  So it's pepper spray or, back
22 then, Taser.  I didn't carry pepper spray when I had
23 a Taser because I didn't need it.  I had a Taser.
24     Q.  Does Waveland Police Department teach you
25 to use Taser instead of hands-on?

1    A.    No.  I haven't seen any figures or numbers.

2    Q.    But definitely on the night in question that we're talking about here, would you think that most Waveland police officers would do what you did and use the Taser --

    A.    Probably.

    Q.    -- in that manner?

    A.    Probably.

    MR. MOAK:  That's all I have.

    MR. HARVEY:  Thank you, sir.  I appreciate it.

    - - -

(The deposition was concluded at 12:05 p.m.)